**Dennis SEIFNER, Appellant,**

v.

**TREASURER OF the STATE of Missouri–CUSTODIAN OF the SECOND INJURY FUND, Respondent.**

No. WD 74192.

Missouri Court of Appeals, Western District.

March 27, 2012.

Jerrold Kenter, for Appellant.

Charles L. Clark, Jr., for Respondent.

Before Division Three: JAMES M. SMART, JR., Presiding Judge, VICTOR C. HOWARD, Judge and JAMES E. WELSH, Judge.

VICTOR C. HOWARD, Judge.

Dennis Seifner appeals from the decision of the Labor and Industrial Relations Commission ("the Commission") denying his claim against the Second Injury Fund ("the Fund"). On appeal, Seifner contends that the Commission erred in denying his claim because: (1) the doctrine of collateral estoppel precluded the Fund from relitigating the percentage of permanent partial disability based on the last injury because the same issue was settled between Seifner and his employer; and (2) the Commission disregarded uncontradicted testimony from a medical expert regarding causation and erroneously substituted its own opinion on the issue of causation. The decision of the Commission is affirmed.

**Factual and Procedural Background**

Dennis Seifner filed his claim for compensation on March 22, 2005, claiming that he was injured as a result of repetitive trauma cumulating on March 24, 2003. At that time, Seifner was working in a light duty capacity at Excel Corporation ("Employer").[1] Seifner also filed a claim against the Fund based upon preexisting disabilities. Seifner alleged that he had previously injured his right elbow, his right shoulder, and had injured his neck twice.

On October 2, 1991, while working for Trio Masonry, Seifner fell off of a scaffold onto a concrete floor and injured his right elbow. Seifner filed a workers' compensation claim for the injury and eventually settled the claim with his employer for 16.5% of the body as a whole.

Seifner began working for Employer on April 16, 1992. On August 15, 1994, Seifner sustained an injury to his neck and his right shoulder due to the repetitive bouncing of the forklift he was operating. Seifner underwent a cervical diskectomy and fusion at C4–5. Seifner also underwent surgery for a partial rotator cuff tear. Seifner filed a claim for workers' compensation based on the incident and settled the claim with Employer for 18% of the body as a whole.

After his surgeries, Seifner returned to work on a light duty basis but eventually returned to his forklift job. Seifner sustained another cervical injury on August 5, 2002. Seifner attributed the injury to constantly looking up and behind him and to bouncing on hard floors while operating

---

1. The plant was owned by Tyson Foods when Seifner began working there but was later sold to Excel Corporation.

the forklift. Seifner underwent a cervical fusion at C6–7 on December 17, 2002. Seifner filed a workers' compensation claim based on the incident and settled the claim with Employer for 21% of the body as a whole.

Following the neck surgery, Seifner returned to work with Employer sometime in January 2003. He was placed on light duty, which included cleaning cafeteria tables and working in the supply room. On February 13, 2003, Seifner went to see Dr. Janie Vale because he was experiencing pain in the mid-thoracic area at the T7–8 level. Seifner told Dr. Vale that at that time his job duties included wiping down tables in the cafeteria and emptying ashtrays. He told Dr. Vale that he could sit down any time he wanted to and that he felt better if he was able to get a lot of rest.

In mid to late February, Seifner began working on the pork production line. Seifner's job on the production line required him to place stickers on the packages of pork and ensure that the packages were properly wrapped in cellophane. If a package was improperly wrapped, Seifner had to remove the package from the conveyor belt and stack it on a rack designated for defective packages.

Seifner's employment was terminated on March 23, 2003, due to excessive absences. Seifner thereafter filed a claim for workers' compensation based on his thoracic injury, alleging that the injury resulted from the repetitive nature of his work on the production line. On April 2, 2009, Seifner settled his claim with Employer for 10% permanent partial disability.

Seifner proceeded on his claim against the Fund, and a hearing was held before an administrative law judge ("ALJ") on October 6, 2010. At the hearing, Seifner testified that his job on the production line involved repetitive bending and twisting movements and that he had to stand and look down at the conveyor belt. He testified that his work on the production line caused him pain in the thoracic area of his back. Seifner stated that the thoracic pain started when he began working on the production line and that he did not have any problems when he was cleaning the cafeteria tables because he could sit down and rest whenever he wanted to.

The deposition testimony and report of Dr. James Stuckmeyer were entered into evidence. Dr. Stuckmeyer examined Seifner on March 24, 2009, at the request of Seifner's counsel. In his report, Dr. Stuckmeyer noted that Seifner said that as a result of the repetitive nature of his job duties, he injured his thoracic spine. Seifner told Dr. Stuckmeyer that even his light duty responsibilities of "cleaning tables and placing labels" caused him to develop pain in the thoracic region. Dr. Stuckmeyer concluded in his report that "the light duty condition following [Seifner's] return to work was a substantial contributing factor [in] the development of ... scapular thoracic dysfunction with chronic thoracic pain." Dr. Stuckmeyer assessed 12.5% permanent partial disability to the body as a whole.

On cross-examination, counsel for the Fund elicited the following testimony from Dr. Stuckmeyer regarding his knowledge of the circumstances surrounding Seifner's injury:

Q. Did [Seifner] tell you how many hours per week that he worked?

A. I don't recall asking.

. . . .

Q. Do you know how many hours per day that he worked in this light duty status?

A. I don't recall asking, ma'am.

. . . .

Q. Do you know how many tables he was responsible for cleaning?

A. No.

Q. Do you know what the breakdown was in his daily shift, how many hours he spent cleaning tables and how much time he spent placing labels?

A. No, ma'am.

Q. Do you know how many breaks he was allowed to take?

A. No, ma'am.

Q. How long his lunch period was?

A. No.

. . . .

Q. Do you know how he went about cleaning these tables, whether he just wiped them with a rag or exactly the procedure?

A. No.

Q. The placing labels, how did he perform that duty?

A. I am unaware.

Q. Do you know if he had any particular requirement for so many labels per hour, anything of that sort?

A. I do not.

In its findings of fact and rulings of law, the ALJ found that the factual basis for Dr. Stuckmeyer's causation opinion had been significantly impeached. The ALJ pointed out that Dr. Stuckmeyer had conceded that he was unaware of how many hours a day Seifner worked on the production line, how many days Seifner worked on the production line, and how Seifner performed his production line duties. Based on these factors, the ALJ found that Dr. Stuckmeyer's opinion regarding causation was not credible. Therefore, due to the lack of credible medical evidence on the issue of causation, the ALJ found that there was no compensable occupational disease and denied Seifner's claim against the Fund.

Seifner filed an application for review with the Commission. The Commission affirmed and adopted the decision of the ALJ, finding it to be supported by competent and substantial evidence on the whole record and in accordance with Missouri law. Seifner's appeal from the Commission's decision followed.

### Standard of Review

Our standard of review is governed by section 287.495.1, RSMo 2000, which provides:

> The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award;
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

An appellate court " 'must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence.' " *Angus v. Second Injury Fund*, 328 S.W.3d 294, 297 (Mo.App. W.D.2010) (quoting *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003)). In reviewing the Commission's decision, we view the evidence objectively and not in the light most favorable to the decision of the Commission. *See id.* However, we defer to the Commission on issues involving the credibility of witnesses and the weight given to their testimony. *Id.* at 300. When, as here, "the Commission af-

firms and adopts the ALJ's award, we review the ALJ's findings as adopted by the Commission." *ABB Power T & D Co. v. Kempker,* 236 S.W.3d 43, 48 (Mo.App. W.D.2007).

## Discussion

■ In his first point on appeal, Seifner contends that the Commission erred in denying his claim because the doctrine of collateral estoppel precluded the Fund from relitigating the percentage of permanent partial disability agreed upon in the settlement between himself and Employer. In essence, Seifner argues that the Fund is bound by the terms of the settlement between himself and Employer.

The Eastern District faced the same argument in *Totten v. Treasurer of State,* 116 S.W.3d 624 (Mo.App. E.D.2003). In *Totten,* the Commission found that the claimant had failed to prove that a work-related accident occurred and denied his claim against the Fund. *Id.* at 626. However, the claimant had entered into a settlement with his employer for the alleged accident for 12.5% of the whole body. *Id.* The claimant argued that the settlement effectively established that an accident had occurred and that the Fund was bound by the terms of the settlement. *See id.* at 627. The court noted that no attorney on behalf of the Fund had signed the settlement, and the claimant did not assert that the Fund was otherwise a party to the settlement. *Id.* at 629. There was no evidence in the record from which the court could find that the Fund expressly consented to or joined in the settlement agreement. *Id.* Therefore, the court found that the Fund was not bound by the terms

of the settlement agreement entered into by the claimant and his employer.[2] *Id.*

The same facts are present in this case. No attorney on behalf of the Fund signed the settlement, and Seifner does not assert that the Fund was a party to the settlement; the agreement was between only Seifner and Employer. There is no evidence in the record that the Fund consented to or joined in the settlement agreement. Therefore, based on the rationale in *Totten,* the Fund is not bound by the terms of the settlement between Seifner and Employer.

■ Moreover, Seifner's collateral estoppel argument fails. "The doctrine of collateral estoppel provides that an issue judicially determined in one action may not be relitigated in another action." *Shahan v. Shahan,* 988 S.W.2d 529, 532 (Mo. banc 1999). In deciding whether collateral estoppel applies, we consider the following:

(1) whether the issue decided in the prior adjudication was identical with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or was in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit.

*Id.* at 532–33. Seifner has demonstrated that the same issue was presented in each action. The settlement between Seifner and Employer resolved the issue of Employer's compensation liability for the last

2. Seifner argues that another case from the Eastern District is in conflict with *Totten.* *See Conley v. Treasurer of Mo.,* 999 S.W.2d 269 (Mo.App. E.D.1999), *overruled on other grounds by Hampton,* 121 S.W.3d 220. However, the court in that case merely held that a

settlement between a claimant and his employer was admissible in that it was relevant as proof of the employee's percentage of disability from his last injury. *Id.* at 275. Therefore, the holding of *Conley* does not conflict with that of *Totten.*

injury. In the present case, the Commission was required to determine the compensation liability of Employer prior to determining the liability of the Fund. *See* § 287.220.1, RSMo 2000. However, Seifner is unable to establish the other three elements of collateral estoppel.

Seifner argues that the settlement agreement constitutes a judgment on the merits of the issue because an ALJ or the Commission must approve any such settlement. *See* § 287.390, RSMo Cum.Supp. 2011. Although the settlement must be approved, "[t]he ALJ has no power to coerce a settlement of a workers' compensation claim, but only has veto power to refuse to approve the settlement already made if he deems it not in accordance with the rights of the parties." *Conley*, 999 S.W.2d at 274; § 287.390. The settlement entered into by Seifner and Employer was voluntary and based upon their own stipulations. In a case involving similar circumstances, this court found that a consent order based upon the joint stipulations of the parties did not constitute a judgment on the merits for the purposes of collateral estoppel. *See State ex rel. Malan v. Huesemann*, 942 S.W.2d 424, 430 (Mo.App. W.D.1997). Although the settlement was reviewed by an administrative hearing commission, the commission merely found that the stipulations were true as agreed to by the parties. *Id.* at 429. Therefore, this court found that where the commission did not independently review the stipulations to determine whether the facts contained therein were true, the consent order did not constitute a judgment on the merits. *Id.* at 429–30.

The same reasoning applies in this case. Although section 287.390 requires an ALJ or the Commission to approve the settlement, the administrative body need only determine that the settlement is in accordance with the parties' rights; it does not engage in independent fact-finding regarding the parties' stipulations. Therefore, the settlement agreement between Seifner and Employer did not constitute a judgment on the merits of the issue for the purposes of collateral estoppel. Furthermore, where Seifner and Employer chose to stipulate to certain facts and settle the issue, and the Fund was not a party to the settlement, the Fund did not have a full and fair opportunity to litigate the issue at the time. *See State ex rel. Malan*, 942 S.W.2d at 430.

Finally, Missouri law is clear that the employer and the Fund are two separate parties, and that an employee's claims against the employer and against the Fund are separate proceedings. *See Grubbs v. Treasurer of Mo.*, 298 S.W.3d 907, 912 (Mo.App. E.D.2009); *see also* 8 CSR 50–2.010(7)(B) (providing that "[a] claim against an employer/insurer and [the Fund] are against two (2) separate parties and the assertion of a claim against one is not an assertion of a claim against the other"). Additionally, the Fund is not a party in privity with Employer. Missouri courts have found that privity exists where "the party sought to be precluded has interests that are so closely aligned to the party in the earlier litigation that the non-party can be fairly said to have had its day in court." *James v. Paul*, 49 S.W.3d 678, 683 (Mo. banc 2001). Pursuant to section 287.220, "the employer is liable only for the percentage of disability for [the] employee's last injury without any pre-existing disability." *Conley*, 999 S.W.2d at 275; § 287.220.1. Where the Fund is exposed to a potentially much larger amount of liability than Employer, it cannot be said that its interests were adequately represented by Employer in its voluntary settlement with Seifner.

Where Seifner cannot establish all of the elements necessary to apply collateral es-

toppel, we find that the doctrine does not preclude the Fund from litigating the issues regarding Seifner's last injury. Seifner's first point is denied.

In his second point on appeal, Seifner contends that the Commission erred in denying his claim based upon a finding that Dr. Stuckmeyer's medical causation opinion was not credible. Seifner claims that the Fund was required to introduce medical evidence to challenge the credibility of Dr. Stuckmeyer and that the Commission was not entitled to ignore Dr. Stuckmeyer's uncontradicted opinion and substitute its own opinion regarding causation.

■■■■ We first address Seifner's argument that the Fund was required to introduce medical evidence to challenge Dr. Stuckmeyer's testimony. The claimant has the burden of proving all essential elements of his claim, including the element of causation. *Bond v. Site Line Surveying*, 322 S.W.3d 165, 171 (Mo.App. W.D.2010). The Fund need not establish by medical evidence or otherwise that the injury was caused by something other than the employee's job; rather, the employee has the burden to prove a direct causal link between his injury and his employment. *See id.* Therefore, the Fund was not required to introduce any medical evidence on the issue of causation in order to challenge Dr. Stuckmeyer's testimony.

■■■■ As to the Commission's finding regarding the credibility of Dr. Stuckmeyer's testimony, the Commission may accept or reject medical evidence and " 'is free to disbelieve uncontradicted and unimpeached testimony.' " *Id.* (quoting *Cardwell v. Treasurer of State of.Mo.*, 249 S.W.3d 902, 907 (Mo.App. E.D.2008)). However, " '[t]he Commission may not arbitrarily disregard and ignore competent, substantial, and undisputed evidence of witnesses who are not shown by the rec-

ord to have been impeached and the Commission may not base its findings upon conjecture or its own mere personal opinion unsupported by sufficient and competent evidence.' " *Id.* (quoting *Cardwell*, 249 S.W.3d at 907). In particular, " 'the commission may not substitute an administrative law judge's personal opinion on the question of medical causation of an injury for the uncontradicted testimony of a qualified medical expert.' " *Angus*, 328 S.W.3d at 300 (quoting *Wright v. Sports Associated, Inc.*, 887 S.W.2d 596, 600 (Mo. banc 1994)). When expert medical testimony is provided, " 'an ALJ's personal views of the evidence cannot provide a sufficient basis to decide the causation question, at least where the ALJ fails to account for the relevant medical testimony.' " *Id.* (quoting *Van Winkle v. Lewellens Prof'l Cleaning, Inc.*, 258 S.W.3d 889, 898 (Mo.App. W.D.2008)).

Seifner argues that the case at hand is similar to *Angus*. In *Angus*, the claimant suffered from two types of arthritis, only one of which was work-related. *Id.* at 299. The sole medical testimony before the Commission established that the claimant's disability resulted from a combined effect of the two types of arthritis. *Id.* The Commission rejected that evidence and found that the arthritis which was not work-related was the sole cause of the claimant's disability. *Id.* Where there was no medical evidence in the record to support such a finding, this court concluded that the Commission had improperly formed its own medical opinion as to causation. *Id.* at 302. Ultimately, this court found that "the Commission has simply failed to articulate any reasonable basis to disregard the uncontradicted expert medical opinion before it and, instead, to create its own medical causation opinions without the aid or assistance from a qualified medical professional." *Id.* at 303.

This case is distinguishable from *Angus*. Although the Commission disregarded Dr. Stuckmeyer's testimony regarding causation, it did not form its own opinion as to an alternative theory of causation which was unsupported by the evidence. Rather, the Commission merely found that Dr. Stuckmeyer's opinion was not credible and that due to the lack of credible medical evidence on the issue of causation, it could not find in Seifner's favor.

 Moreover, Dr. Stuckmeyer's testimony was impeached, and the Commission identified several reasons as to why it was discrediting Dr. Stuckmeyer's opinion. In his report, Dr. Stuckmeyer relied on Seifner's statement that "even light duty status of cleaning tables and placing labels" contributed to his thoracic pain. However, at the hearing before the ALJ, Seifner testified that he never had any problems while cleaning tables in the cafeteria. The Commission noted that Dr. Stuckmeyer did not know how many days, or hours per day, Seifner worked on the production line. Furthermore, Dr. Stuckmeyer was only aware that Seifner's job involved "placing labels"—he was completely unaware of how Seifner performed any of his light duty jobs. The Commission's findings demonstrate that it had a reasonable basis for concluding that Dr. Stuckmeyer lacked credibility regarding the causation issue.

Contrary to the circumstances in *Angus*, the Commission did not form its own medical opinion as to causation in this case. Instead, the Commission found that Dr. Stuckmeyer's opinion was significantly impeached and was therefore not credible on the issue of causation. Where the factual basis of Dr. Stuckmeyer's causation opinion was impeached, the Commission did not err in disregarding it and finding that Seifner had not adequately proven the element of causation. Seifner's second point is denied.

The decision of the Commission is affirmed.

All concur.