

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| ULYSSES WHITE (DECEASED);<br>PATRICIA WHITE, | ) | |
| | ) | |
| | ) | **WD79449** |
| Appellant, | ) | |
| | ) | **OPINION FILED:** |
| v. | ) | **September 27, 2016** |
| | ) | |
| CONAGRA PACKAGED FOODS,<br>LLC, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

**Appeal from the Labor and Industrial Relations Commission**

Before Division Two:  Karen King Mitchell, Presiding Judge, Cynthia L. Martin, Judge
and Gary D. Witt, Judge

Patricia White ("Patricia") appeals from the Labor and Industrial Relations
Commission's ("Commission") decision denying compensation for the death of her
husband, Ulysses White ("Ulysses").[1]  Patricia asserts that the Commission erred in
concluding that she failed to sustain her burden to prove that Ulysses's work environment
was the prevailing factor in causing her husband's death at work because: (1) the

---

[1]Because Patricia White and Ulysses White share a surname, we refer to each by their first name for
purposes of clarity.  No familiarity or disrespect is intended.

Commission improperly applied the prevailing factor test to her entire case and not just to the issue of injury; and (2) the Commission arbitrarily ignored lay testimony that would have coupled with credible expert testimony to establish that Ulysses's death came from a hazard or risk of employment. Because the issue to be determined in this case was whether Ulysses's death came from a risk or hazard unrelated to employment, and not whether work conditions were the prevailing factor in causing Ulysses's death, we conclude that the Commission committed legal error. We affirm in part, reverse in part, and remand for further proceedings.

**Factual and Procedural History**

Ulysses worked for ConAgra Packaged Foods, Inc. ("ConAgra") for twenty-four years in Marshall, Missouri. At the time of his death, Ulysses worked in ConAgra's machine shop making parts for the facility's production line. The machine shop did not have air conditioning but did have windows and fans to help cool the building. Ulysses's job required him to use machinery such as mills and lathes, and required him to wear a long-sleeved uniform and hard hat. Ulysses's typical work schedule was from 5 a.m. to 3:00 p.m., six to seven days per week.

On June 30, 2012, Ulysses reported to work for his usual shift. Ulysses was wearing a leg brace due to a tendon injury in his foot. When Ulysses arrived at work, he spoke with his supervisor, Abraham Sellers ("Sellers"). Sellers warned Ulysses about the forecasted heat that day and asked Ulysses to watch for signs of heat stress. Sellers informed Ulysses that there would be a scheduled power outage that morning and instructed Ulysses to ensure that the waste water system's pumps restarted following the outage.

2

Ulysses began his work day in the machine shop making parts. Following the scheduled power outage that occurred sometime between 9:00 a.m. and 9:30 a.m., Ulysses walked from the machine shop to the waste water system pumps to ensure they had restarted. Ulysses then walked back to the machine shop, where he continued his work until taking a thirty-minute break for lunch at 11:00 a.m.

One of Ulysses's co-workers found him collapsed on the floor in the machine shop at approximately 11:45 a.m. Despite receiving medical attention, Ulysses died the same day. An autopsy revealed that the cause of Ulysses's death was "a cardiac arrhythmia resulting from severe coronary artery disease." The autopsy noted evidence of pericardial adhesions, coronary artery disease, and emphysema.

Patricia filed a claim for compensation in January 2013, alleging that Ulysses suffered a "[h]eat stroke and/or cardiac injury resulting in death" while he was working in ConAgra's machine shop. During a hearing in front of an Administrative Law Judge ("ALJ"), Patricia and ConAgra each presented expert witness testimony about the cause of Ulysses's death through deposition testimony and written reports.

Patricia's expert witness, Dr. Stephen Schuman ("Dr. Schuman"), specializes in internal medicine and cardiology. Dr. Schuman opined that the "work activities of 06/30/12 were the prevailing factor causing [Ulysses's] cardiac arrest and death." Dr. Schuman explained:

> I would say the physical work he was doing [was the most important factor that caused Ulysses to have a cardiac event on June 30, 2012]. When you're operating a lathe, you're using the upper extremities to some extent. There's some isometric component to that effort. He was doing that in a hot environment, and that is a type of pathologic stress on the cardiovascular

3

system that could cause ischemia, electrical instability, cardiac arrest. It can cause infarction, a rise of troponin, those sort of problems. And if you add in the additional problems, ambulating with a brace on his leg and whatever discomfort he was having in the foot and ankle, then that would add to additional stress, additional increased heart rate, blood pressure, coronary, tone, et cetera, on his cardiac work, basically on his cardiovascular system.

. . . .

He was in an indoor environment where it was probably hotter than outside, the environmental temperature, plus he was working. He was doing physical effort. There was a component with his arms working on the lathe. And he would have been more overheated than the average person with a brace on his leg, a long-sleeved shirt and a hard hat.

. . . .

[Y]ou dissipate heat from your head. About 25 percent of heat loss from the body is from the head of the top of the head.

. . . .

[H]e had long pants and long sleeves, and you put that all together, and he's going to get a little hotter than the average person in Marshall, Missouri that day who might not have been dressed -- might have been dressed more for the weather and might not have been doing physical work.

Dr. Schuman acknowledged on cross-examination that Ulysses had high cholesterol and hypertension. He also acknowledged that Ulysses had an 80 percent occlusion in the left descending coronary artery and a 75 percent circumflex occlusion. Dr. Schuman noted that an occlusion increases the risk of ischemia if the heart is required to work harder, demanding more blood flow. However, Dr. Schuman opined that Ulysses's ischemia was not caused by his pre-existing conditions, but was instead caused by the stress imposed on Ulysses by the conditions of his work on the day of his death.

ConAgra's expert witness, Dr. Michael Farrar ("Dr. Farrar"), is an adult cardiologist. Dr. Farrar opined that Ulysses "died of sudden cardiac death related to the prevailing causes

4

of underlying severe coronary artery disease and hypertensive heart disease, caused by traditional risk factors." He explained:

> [Ulysses] almost certainly died from ventricular fibrillation (sudden cardiac death) due to a combination of severe coronary artery disease and hypertensive heart disease with consequent left ventricular hypertrophy. Myocardial ischemia secondary to the above would have resulted in the arrhythmias. No thrombus was noted in the coronary arteries, indicating absence of acute plaque rupture and subsequent myocardial infarction, but this is the case in about 50% of cases of sudden cardiac death. The finding at autopsy were caused by traditional risk factors of hypertension, dyslipidemia, prior cigarette smoking and lack of regular physical exercise. His poor functional capacity on stress testing indicating an increased risk of future adverse cardiac events. His cardiac enlargement and left ventricular hypertrophy also increased his risk of sudden cardiac death. Sudden cardiac death is the initial manifestation of coronary artery disease in about 15% of patients with coronary artery disease and is certainly common.

Dr. Farrar dismissed the possibility of heat as a factor in Ulysses's death because Ulysses had worked in similar conditions for many years and was likely acclimated to the heat.

In addition to this expert testimony, Patricia testified about the extreme heat during the week of Ulysses's death. She testified that the temperature reached 96 degrees at 11:00 a.m. the day before Ulysses died. Numerous exhibits were admitted, including the depositions of Sellers, Patricia, and other workers--Pedro Estrada, Jose Sanchez, and Charles Vandiver. United States Government Weather Station information regarding the temperature in the area on the day of Ulysses's death indicated a high of 100 degrees and a low of 76 degrees.

The ALJ denied compensation. The ALJ concluded that Patricia "failed to sustain her burden of proof that [Ulysses] sustained an accident or occupational disease." The ALJ observed that both Dr. Schuman and Dr. Farrar "agree that the mechanism of death was

5

ischemia or lack of blood flow to [Ulysses's] heart which caused ventricular fibrillation and cardiac death." And the ALJ observed that "[b]oth physicians also agree that the coronary artery could not supply adequate blood to [Ulysses's] heart." The ALJ then concluded:

> While Dr. Farrar does not believe that the temperature was a factor in the sequence of events leading to Mr. White's death, Dr. Schuman opines that the physical work at the lathe in a hot environment could cause ischemia, electrical instability, cardiac arrest, infarction and a rise of troponin. However, Dr. Schuman concedes that the prevailing factor was [Ulysses's] heart having to work harder than the severely compromised left anterior descending coronary artery would allow. In other words, [Ulysses's] heart needed more blood than the left anterior descending coronary artery which had a blockage of 80 percent could deliver. Even Dr. Schuman agreed that there was nothing unusual or different about [Ulysses's] work on June 30, 2012, only that the heart needed more blood than the artery could supply. Dr. Farrar and Dr. Schuman's opinion is supported by the autopsy report which also refers to cardiac arrhythmia caused by the severe coronary artery disease.

Patricia appealed the ALJ's decision to the Commission. The Commission affirmed the decision of the ALJ with a supplemental opinion.

The Commission rejected the ALJ's finding that Ulysses had not suffered an accident. The Commission concluded that Ulysses had suffered an accident as his "death at work was an 'unexpected traumatic event.'"

The Commission then analyzed whether Ulysses suffered a compensable injury, believing that the parties' request that the ALJ find whether "work was the prevailing factor in causing the alleged accident or occupational disease" was intended to invoke the "prevailing factor" test to determine medical causation described generally in section

6

287.020.3(1), and more specifically for cardiovascular injuries at section 287.020.3(4).[2] In resolving this issue, the Commission did not address Dr. Farrar's expert testimony at all, and focused exclusively on Dr. Schuman's testimony.

The Commission acknowledged that it was Dr. Schuman's opinion that Ulysses's "work activities on June 30, 2012, were the prevailing factor causing his death, because the weather was hot that day, and the conditions in the machine shop where [Ulysses] worked rendered his physical exertions more strenuous (and thus more demanding upon his heart) that they might otherwise have been."[3] The Commission concluded:

> While Dr. Schuman's general theory of medical causation is not, in our view, inherently incredible, after careful consideration, we are not sufficiently persuaded that Dr. Schuman possessed the necessary factual foundation to support his theory.

The Commission noted the following defects in the "factual foundation" supporting Dr. Schuman's causation opinion: (1) though "Dr. Schuman theorized the work activity of operating a lathe would include 'some isometric component,' he was not more specific as to the exertions he understood such work to entail"; (2) Patricia's other evidence did not establish the physical exertions involved in Ulysses's operation of the lathe; (3) Dr. Schuman's opinion was based on an assumption that Ulysses was operating the lathe from around 6:30 a.m. until around 11:45 a.m., with the exception of some possible breaks,

---

[2]"In a workers' compensation case, the statute in effect at the time of the injury is generally the applicable version." *Anderson v. Veracity Research Co.*, 299 S.W.3d 720, 725 (Mo. App. W.D. 2009). Thus, all statutory references are to RSMo 2000 as supplemented through June 30, 2012.

[3]The Commission noted that although Patricia's claim "included an issue of 'occupational disease' as one for determination by the [ALJ], Dr. Schuman testified only as to an 'accident' theory of injury," and as a result, the Commission could not "consider whether, for example, the cumulative strain of working consecutive 12-hour days in hot weather may have played any role in the cardiac event that caused [Ulysses's] death." Patricia has not appealed this determination.

though the assumption "[was] demonstrably incorrect" as uncontested testimony from coworkers indicated that Ulysses was involved in other activities during that timeframe, which activities were not addressed by Dr. Schuman because he was unaware of them; and (4) "although Dr. Schuman pointed to the heat on June 30, 2012, as a necessary component of his opinion . . . , Dr. Schuman admitted he was not aware of the actual temperature that day. Critically, Dr. Schuman further admitted he was unaware of the ambient temperature within the machine shed where [Ulysses] worked. Instead Dr. Schuman relied purely on the generalized assertion from employee's coworker that 'it was hot.'"

The Commission thus concluded that "Dr. Schuman [was] insufficiently informed as to the relevant facts underlying his own theory of medical causation," and as a result, the Commission "deem[ed] his testimony on the subject to be ultimately unpersuasive." "Because the cardiac pathology leading up to and causing employee's death is, in our estimation, beyond the realm of lay understanding, we find that the failure to present persuasive expert testimony on the issue of medical causation prevents us from rendering an award in claimant's favor."

The Commission's final award was not unanimous. One member of the Commission filed a dissenting opinion observing that Dr. Schuman had made clear that "the *exact* temperature in the machine shop or [Ulysses's] *exact* movements in operating the lathe" were simply not relevant to his theory of medical causation, such that the Commission's majority's attribution of relevance to these missing foundation facts resulted in the Commission majority "appoint[ing] themselves the de facto medical experts in this case." The dissenting opinion also pointed out that several lay witnesses testified it was

8

very hot on the day of Ulysses's death. The dissenting opinion thus indicated its agreement with the Commission majority's finding that Dr. Schuman's theory of causation was credible, and its corresponding implied finding that Dr. Schuman's opinion was more credible than Dr. Farrar's causation opinion.

Patricia filed this timely appeal.

## Standard of Review

To the extent that the Commission's findings and final award depart from the ALJ's findings of fact and conclusions of law, we review the Commission's findings and final award. *Lincoln Univ. v. Narens*, 485 S.W.3d 811, 814 (Mo. App. W.D. 2016). To the extent the Commission adopts the ALJ's findings of fact and conclusions of law, we review the ALJ's findings and conclusions. *Id.* We may modify, reverse, remand for rehearing, or set aside the award of the Commission only if we determine that the Commission acted without or in excess of its powers, that the award was procured by fraud, that the facts found by the Commission do not support the award, or that there was not sufficient competent evidence to warrant making the award. Section 287.495.1.

"'We review the whole record to determine whether there is sufficient competent and substantial evidence to support the award or if the award is contrary to the overwhelming weight of the evidence.'" *Lincoln Univ.*, 485 S.W.3d at 814 (quoting *Gleason v. Treasurer of State of Mo.-Second Injury Fund*, 455 S.W.3d 494, 497 (Mo. App. W.D. 2015)). In doing so, we defer to the Commission's factual findings, including any credibility determinations made by the Commission. *Id.* at 815. We "may not substitute [our] judgment on the evidence, and when the evidence before an administrative body

9

would warrant either of two opposed findings, [we are] bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Id.* Legal determinations made by the Commission, however, are reviewed independently. *Id.*

## Analysis

Patricia presents two points on appeal, both of which challenge the Commission's conclusion that Patricia failed to sustain her burden to prove that Ulysses's work environment on June 30, 2012, was the prevailing factor in causing his death. Patricia's first point on appeal argues that the Commission improperly applied the prevailing factor test to the entire case and not just to the issue of injury. Patricia's second point on appeal argues that the Commission arbitrarily ignored lay testimony that would have coupled with Dr. Schuman's credible testimony establishing that Ulysses's death came from a hazard or risk of employment.

Point one on appeal is dispositive of this case. We agree that the Commission erroneously applied the prevailing factor test to the entire case. In the process, the Commission erroneously recast the medical causation standard applicable to cardiac injury cases to require proof that "work conditions" were the prevailing factor in causing Ulysses's death, when that inquiry should have been whether Ulysses's conceded accident was the prevailing factor causing his death. And in the process, the Commission failed to determine whether Ulysses's injury (his death) came from a hazard or risk unrelated to employment, a determination as to which neither the Workers' Compensation Act nor case law authorize

10

application of a prevailing factor standard. As a result, we need not address point two on appeal.

## Point One

Patricia's first point on appeal argues that the Commission committed legal error by erroneously applying the prevailing factor test to her entire case. Patricia explains that the Commission "assumed there was an 'accident' and then analyzed [Ulysses's] hot working environment under the prevailing factor test for 'injury' in the guise of medical causation." [Appellant's Brief, p. 22] In the process, according to Patricia, the Commission "short-circuited the analysis, [and] did not adequately address the elements in the definition of accident and injury as stated in [section] 287.020." [Appellant's Brief, p. 23] We agree.

Under the Missouri Workers' Compensation Law,[4] an employer "shall be liable, irrespective of negligence, to furnish compensation under the provisions of this chapter for ***personal injury or death of the employee by accident arising out of and in the course of the employee's employment***." Section 287.120.1 (emphasis added). This statute, which generally captures the scope of an employer's workers' compensation liability, identifies three distinct legal concepts: (i) "personal injury or death;" (ii) "by accident;" and (iii) "arising out of and in the course of . . . employment." *Id.*

The Commission found that Ulysses sustained an accident. ConAgra has not challenged the Commission's conclusion. "Accident" is defined by section 287.020.2 as:

> [A]n unexpected traumatic event or unusual strain identifiable by time and place of occurrence and producing at the time objective symptoms of an injury caused by a specific event during a single work shift.

---

[4]The Missouri Workers' Compensation Law is found in Chapter 287.

11

As we explained in *Young v. Boone Electric Cooperative*, 462 S.W.3d 783, 794 (Mo. App. W.D. 2015), the statutory definition of "accident" includes four components:

(1)    An unexpected traumatic event or an unusual strain:
(2)    Identifiable by time and place of occurrence;
(3)    Producing at the time objective symptoms of an injury; and
(4)    Caused by a single event during a single work shift.

The Commission found that Ulysses sustained an accident because his death at work was an unexpected traumatic event. ConAgra does not contest that Ulysses suffered an accident as that term is defined. Though we agree that the record as a whole supports the Commission's conclusion that Ulysses sustained an accident when he died at work, it was technically imprecise for the Commission to characterize Ulysses's death as an unexpected traumatic event, one of the four components of an accident. Rather, Ulysses's death was the objective symptom of an injury produced by an unexpected traumatic event or unusual strain. Viewing death as an objective symptom of injury, and not as the unexpected traumatic event producing the injury, is consistent with the statutory definition of "injury," as, in pertinent part, "violence to the physical structure of the body." Section 287.020.3(5). And it is consistent with the statutory definition of "death," as, in pertinent part, "death resulting from such violence." Section 287.020.4. Thus, although Ulysses's death at work was the result of an accident, his death was not an unexpected traumatic event. It is axiomatic that Ulysses's death could not have been both an unexpected traumatic event and an objective symptom produced by that event. Instead, it is uncontested that the objective symptom of Ulysses's injury (death) was produced by a sudden cardiac event. Technically, therefore, the sudden cardiac event (not death) was the unexpected traumatic event (or the

12

unusual strain) which caused Ulysses's death.[5] The Commission correctly concluded that Ulysses sustained an accident, although we substitute a technically accurate rationale for the conclusion that is supported by the record as a whole. *See Cruz v. Mo. Dep't of Soc. Servs.*, 386 S.W.3d 899, 905 (Mo. App. W.D. 2012) (holding that our "primary concern is the correctness of the result reached by [an] administrative agency and not the route taken to reach it"); *Champ v. Doe Run Co.*, 84 S.W.3d 493, 495 (Mo. App. E.D. 2002) (holding that we "are entitled to affirm any decision or judgment if the record demonstrates that it is correct, even though the tribunal from which the appeal [is] taken gave erroneous reasons for its conclusion[]").

By concluding that Ulysses sustained an accident, the Commission also necessarily found that Patricia sustained her burden to establish the other two components of an "accident" pursuant to section 287.020.2: (i) that the unexpected traumatic event or unusual strain was identifiable by time and place of occurrence, and (ii) that the unexpected traumatic event or unusual strain was caused by a specific event during a single work shift. Though the Commission did not expressly address these components, the record as a whole plainly establishes that Ulysses's unexpected traumatic event or unusual strain (his sudden cardiac event) was identifiable by time and place of occurrence. Though the Commission did not identify the "specific event in a single work shift" which caused Ulysses's sudden

---

[5]*Young v. Boone Electric Cooperative*, 462 S.W.3d 783, 792-94 (Mo. App. W.D. 2015), discusses the difference between an unexpected traumatic event and an unusual strain as those terms are used in the definition of "accident." In the argument portion of her brief, Patricia argues that Ulysses's sudden cardiac event should have been characterized as an unusual strain, and not as an unexpected traumatic event. The characterization is of no import in this case, as it is uncontested that Ulysses's sudden cardiac event, whether considered an unexpected traumatic event or an unusual strain, produced an objective symptom of injury, Ulysses's death. *See id.* at 793 (holding that "it is possible that a particular 'strain' or 'event' could" be both an unexpected traumatic event and an unusual strain).

13

cardiac event, we held in *Young* that "specific event" means "particular happening." 462 S.W.3d at 794-95. It is uncontested that some particular happening" caused Ulysses's sudden cardiac event. Whether that "particular happening" was, as Dr. Farrar opines, an onset of ischemia secondary to pre-existing coronary disease, or, as Dr. Schuman opines, an onset of ischemia due to a very hot work environment, is irrelevant for purposes of determining that Ulysses suffered an accident. All that matters is that the record as a whole establishes that it is uncontested that Ulysses suffered a sudden cardiac event caused by a specific event during a single work shift.[6]

Having found that Ulysses sustained an accident causing injury (here, death), the Commission was next required to determine whether Ulysses's death was compensable. To be compensable, an injury must satisfy two requirements. First, the injury must have "arisen out of and in the course of employment." Section 287.020.3(1). Second, where the

---

[6]The four components required to constitute an "accident" as defined by section 287.020.2 are devoid of any requirement that the component be causally connected to work, save the temporal requirement that the unexpected traumatic event or unusual strain occur within a single work shift. As we explain, *infra*, the causal connection between an injury caused by accident and work activities is instead the subject of section 287.020.3(1) and (2), addressing the need for an injury to have "arisen out of and in the course of employment."

We recognize that the last sentence of section 287.020.2, which follows enumeration of the four components required to establish an "accident," reads as follows: "An injury is not compensable because work was a triggering or precipitating factor." The sentence by its plain terms does not address whether an accident has been established. The sentence's location in the definition of "accident" is an apparent carryover from the statutory definition of "accident" which was in effect before the 2005 amendment of the Worker's Compensation Act. Then, "accident" was defined as a "work related injury." *See infra* note 9. The 2005 amendment to the Act completely reconstituted the definition of "accident," which is, by its plain terms, defined without reference to "work activities." The last sentence of section 287.020.2 addresses when an injury is not compensable, and ***at best***, strictly read, disqualifies injuries from compensation if the evidence establishes that work was no more than a triggering or precipitating factor in causing the injury. The last sentence of section 287.020.2 does not, however, itself establish an affirmative test which must be established between work activities and an injury as a condition of compensability. It appears plain that the legislature intended this causal connection to be controlled by the standards described in section 287.020.3(2), addressing when an injury is deemed to arise out of and in the course of employment.

14

accident is cardiovascular in nature, as in this case, the accident must be "the prevailing factor in causing the resulting medical condition."[7]  Section 287.020.3(4).

The Commission did not address whether Ulysses's death arose out of and in the course of employment.  Instead, the Commission focused its attention on the second requirement of compensability.  As the Commission correctly noted, when a worker suffers "[a] cardiovascular, pulmonary, respiratory, or other disease, or cerebrovascular accident or myocardial infarction," his injury is compensable "only if the accident [was] the prevailing factor in causing the resulting medical condition."   Section 287.020.3(4). "Prevailing factor" is defined for this purpose by section 287.020.3(1) as "the primary factor, in relation to any other factor, causing . . . the resulting medical condition."

Applied here, the plain language of section 287.020.3(4) required Patricia to establish that Ulysses's accident (the unexpected trauma or unusual strain of a sudden cardiac event) was the prevailing factor (the primary factor in relation to any other factor) causing Ulysses's resulting medical condition (death).  In other words, Patricia had to prove that Ulysses's death was primarily caused by his accident.

The Commission did not frame the issue to be determined pursuant to section 287.020.3(4) in this manner.  Instead, the Commission framed the issue to be determined pursuant to section 287.020.3(4) as whether Ulysses's "work activities on June 30, 2012,

---

[7]Section 287.020.3(4) applies only to "cardiovascular, pulmonary, respiratory, or other disease, or cerebrovascular accident or myocardial infarction" injuries.  For other injuries, the second compensability requirement is set forth in section 287.020.3(1), which requires an "accident [to be] the prevailing factor in causing both the resulting medical condition and disability."

15

were the prevailing factor causing his death." This was legally erroneous.[8] Section 287.020.3(4) does not require a claimant to establish that work activities were the prevailing factor in causing the medical condition for which recovery is sought.

The proper question framed by section 287.020.3(4) was whether Ulysses's accident was the prevailing factor in causing his medical condition--death. Had the Commission considered this question as it assessed Patricia's burden pursuant to section 287.020.3(4), the record as a whole would have supported no other conclusion than that Ulysses's accident (the unexpected traumatic event or unusual strain of a sudden cardiac event) was the prevailing factor in causing his resulting medical condition, death. Both Dr. Farrar and Dr. Schumann agreed that Ulysses died as a result of a sudden cardiac event. In fact, no evidence suggested that Ulysses's death was caused by *any* other factor. The Commission thus committed legal error in concluding that Patricia failed to sustain her burden to establish a compensable injury pursuant to section 287.020.3(4), one of the required features of a compensable injury.

---

[8]*See* discussion, *infra*, at notes 9 and 10. In *Leake v. City of Fulton*, 316 S.W.3d 528, 532 (Mo. App. W.D. 2010), we affirmed an award of benefits to the widow of a decedent who suffered a very similar heart attack at work. In affirming the award, we recognized that the issue presented was "whether [the] particular accident is the 'prevailing factor' causing the employee's [medical] condition." *Id*. However, in response to the employer's argument that the employee's underlying heart disease "prevented a finding that any employment-related accident could possibly have been the prevailing factor causing the death," we stated that "[w]here, as here, both a pre-existing cardiovascular condition and *a work-related activity* contribute to cause an employee's injury or death, the question is which of the contributing factors was 'the [prevailing factor] causing the resulting' injury or death." *Id*. (emphasis added). As we explain in this Opinion, however, the 2005 version of the Act does not require a claimant to prove that "work activities" were the prevailing factor in causing injury. A claimant must show that an *accident* is the prevailing factor in causing injury (section 287.020.3(2)(a)), and that an *accident* is the prevailing factor in causing a resulting medical condition (section 287.020.3(4)). Neither section 287.020.2's definition of accident, nor case law interpreting that definition, require an accident to arise from a work activity. Though *Leake* reached the right result, its discussion of whether work activities were the prevailing factor in causing injury could be read to add an element to the definition of accident, and to that extent, should not be followed.

Because the Commission erroneously found that Patricia failed to sustain her burden to establish a compensable injury pursuant to section 287.020.3(4), the Commission deemed all other issues before it moot. As a result, the Commission did not decide whether Patricia sustained her burden to establish that Ulysses's death arose out of and in the course of his employment, pursuant to section 287.020.3(1), the second required feature of a compensable injury.

Section 287.020.3(2) explains when an injury (here, death), arises out of and in the course of employment:

(2)    An injury shall be deemed to arise out of and in the course of employment only if:

(a)    It is reasonably apparent, upon consideration of all the circumstances, that the accident is the prevailing factor in causing the injury; and

(b)    It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life.

The first prong of this test also employs a prevailing factor test. It is worded differently, however, from the prevailing factor tests set forth in section 287.020.3(1) and corollary section 287.020.3(4) applicable to cardiovascular accidents. Those sections require, respectively, proof that the accident was the prevailing factor in causing *the resulting medical condition and disability* (section 287.020.3(1)), or in causing the *resulting medical condition* (section 287.020.3(4)). (Emphasis added.) The prevailing factor test used to determine if an injury arises out of and in the course of employment focuses on whether the accident is the prevailing factor *causing the injury*, and permits proof of same

17

as is "reasonably apparent, upon consideration of all the circumstances." Section 287.020.3(2)(a).

The General Assembly has not explained the legal distinction between "injury," for which it has provided a statutory definition, and "medical condition." We know that "injury" refers to "violence to the physical structure of the body," and is thus likely limited to the obvious and immediate physical result of an accident. Section 287.020.3(5). We believe that "medical condition" must be intended, therefore, to refer to all medical conditions for which compensation is sought by a claimant, including the injury, and other medical concerns alleged to have resulted from (or been exacerbated by) the injury. We need not resolve this issue. In this case, where death is the conceded result of Ulysses's accident, there can be no difference between the meaning of the terms "injury" and "medical condition." Plainly, Ulysses's accident was not only the prevailing factor, but was indeed the only factor, which caused both his injury and his medical condition. As such, the record as a whole requires the conclusion that Patricia sustained her burden to establish the first prong of the course of employment test set forth in section 287.020.3(2)(a).

However, the second prong of the course of employment test set forth in section 287.020.3(2)(b) is the subject of contested evidence. Dr. Farrar and Dr. Schuman offered competing opinions about whether Ulysses's death came from a hazard or risk of employment. Dr. Schuman opined that Ulysses's death resulted from ischemia (a sudden loss of blood flow to the heart) caused by a hazard or risk related to employment--Ulysses's work environment given the very hot weather conditions. Dr. Farrar opined that Ulysses's

18

death resulted from ischemia caused by pre-existing heart disease, and that hot weather conditions played no role. Both doctors' opinions addressed the role of Ulysses's work environment in his death, and were thus relevant to determining whether Ulysses's death came from a hazard or risk unrelated to employment, ***an issue that is not subject to the prevailing factor standard***. Section 287.020.3(2)(b). Patricia was not obligated, therefore, to establish that Ulysses's work environment was the prevailing factor in causing his death. She was obligated to establish that Ulysses's injury (death) was not caused by a hazard or risk unrelated to employment. In other words, Patricia was required to establish a causal connection between Ulysses's death and his work activities. *Johme v. St. John's Mercy Healthcare*, 366 S.W.3d 504, 510 (Mo. banc 2012) (holding that there must be "a causal connection between the injury at issue and the employee's work activity" for an injury to arise out of employment under section 287.020.3(2)(b)). Patricia's burden of proof for this factual proposition was by a preponderance of the evidence. Section 287.808 (providing in pertinent part that "[i]n asserting any claim . . . based on a factual proposition, the party asserting the claim or defense must establish that such proposition is more likely to be true than not true").

The Commission's confusion in this case may have resulted from the fact that Dr. Farrar and Dr. Schuman offered medical causation opinions on two distinct issues: (i) the causal connection between Ulysses's accident and his injury and medical condition, which was relevant to establishing the prevailing factor tests required by section 287.020.3(1) and section 287.020.3(2)(a), and as to which both experts agreed that a sudden cardiac event produced Ulysses's death; ***and*** (ii) the causal connection between Ulysses's injury and a

19

hazard or risk of employment required by section 287.020.3(2)(b), which is not controlled by a prevailing factor test, and as to which the experts offered opposing opinions. In many workers' compensation cases, the causal connection between an injury and a hazard or risk of employment required by section 287.020.3(2)(b) is within the realm of lay understanding, and need not be established be medical causation evidence. However, there are cases, and this is one of them, where the nature of an injury renders its causal connection to a hazard or risk of employment beyond the realm of lay understanding, necessitating medical causation evidence. Regardless, proof that an injury came from a hazard or risk of employment is not subject to a prevailing factor test,[9] whether the evidence of that required causal relationship is lay or expert in nature. Section 287.020.3(2)(b). Rather, an injury either comes from a hazard or risk unrelated to the employment to which a worker would have been equally exposed outside of and unrelated to the employment in normal nonemployment life, or it does not. In other words, Patricia was required to establish by a preponderance of the evidence not simply that Ulysses had a sudden cardiac event while at work, but because he was at work. *Gleason v. Treasurer of State of Missouri-Custodian of Second Injury Fund*, 455 S.W.3d 494, 499-501 (Mo. App. W.D. 2015).

---

[9]The pre-2005 version of the Missouri Workers' Compensation Act, section 287.020.2, RSMo 2004, provided that "[a]n injury is compensable if it is clearly work related. An injury is clearly work related if work was a substantial factor in the cause of the resulting medical condition or disability." Under this version of the Act, it was a claimant's burden to establish that work was a substantial factor in causing the resulting medical condition or disability. However, the General Assembly amended this compensability test in 2005, and now requires a claimant to establish that the ***accident*** (not work) was the prevailing factor in causing the resulting medical condition and disability. Section 287.020.3(1). The assessment of whether the injury was related to work activities is now separately determined pursuant to section 287.020.3(2)(a) and (b). Though section 287.020.3(2)(a) also includes a prevailing factor test, it requires only that the accident is the prevailing factor causing the injury. Section 287.020.3(2)(b) is the only prong of the course of employment test that refers to work activities. It requires that an injury not come from a hazard or risk unrelated to work, but is not subject to the prevailing factor test for its proof.

20

Here, the Commission failed to afford proper consideration to Dr. Schuman's testimony regarding the causal connection between Ulysses's injury and the hazard and risk of his employment. The Commission found Dr. Schuman's theory of medical causation on this subject to be "not . . . inherently incredible." In other words, the Commission accepted as credible Dr. Schuman's testimony that Ulysses's injury could have come from a hazard or risk of his employment. However, the Commission nonetheless found Dr. Schuman's causation opinion on this subject to be "ultimately unpersuasive," a conclusion it reached after erroneously measuring Dr. Schuman's opinion against the prevailing factor test. It is thus necessary for us to remand this matter to the Commission for the limited purpose of determining whether Patricia sustained her burden to establish, by a preponderance of the evidence, that Ulysses's death came from a hazard or risk of employment,[10] and if so, to calculate the compensation Patricia is entitled to receive.

Because the issue will likely repeat itself on remand, we raise an additional concern. The Commission found Dr. Schuman's opinion that Ulysses's death came from a hazard or risk of employment unpersuasive based on "foundational facts" it identified as missing from Dr. Schuman's testimony. Specifically, the Commission found Dr. Schuman's

---

[10]Ulysses's pre-existing heart disease is not sufficient standing alone to permit the Commission to conclude that Ulysses's death was unrelated to a hazard or risk of employment. *See Malam v. State*, No. SC95170, 2016 WL 3553059, at *3 (Mo. banc June 28, 2016); *Leake v. City of Fulton*, 316 S.W.3d 528 (Mo. App. W.D. 2010) (affirming award of workers' compensation benefits to the widow of a deceased worker who died after ischemia induced by a hazard or risk of employment triggered ventricular fibrillation and death, notwithstanding severe pre-existing heart disease). Here, ConAgra has not asserted as an affirmative defense that Ulysses's "injury result[ed] directly or indirectly from idiopathic causes." Section 287.020.3(3); *see Gleason v. Treasurer of State of Mo.-Custodian of Second Injury Fund*, 455 S.W.3d 494, 502 (Mo. App. W.D. 2015) (holding that claim that injury resulted from idiopathic cause is in the nature of an affirmative defense). However, the fact remains that Dr. Farrar opines that heat played no role in causing Ulysses's death (and thus, that his death was not a result of a hazard or risk of employment), while Dr. Schuman opines that Ulysses's death was the result of a hazard or risk of employment, namely working in a very hot, non-air conditioned building, wearing a brace on a painful foot injury, a long-sleeved shirt, long pants, and a hard hat.

21

opinion unpersuasive because: he did not characterize Ulysses's exertion in operating the lathe as light, medium, or heavy; he did not know exactly how long Ulysses operated the lathe between the hours of 6:30 a.m. and 11:45 a.m.; and he did not know the actual outdoor or ambient temperature on the day of Ulysses's death, and relied instead on lay witness characterizations of the day as "very hot."

We have held that "[t]he question of causation is one for medical testimony." *Angus v. Second Injury Fund*, 328 S.W.3d 294, 300 (Mo. App. W.D. 2010). Thus, the Commission may not substitute personal opinion on medical causation where "'medical causation cannot be considered uncomplicated.'" *Id.* at 301 (quoting *Wright v. Sports Associated, Inc.*, 887 S.W.2d 596, 600 (Mo. banc 1994)). Here, the Commission held that "the cardiac pathology leading up to and causing [Ulysses's] death is, in our estimation, beyond the realm of lay understanding." It necessarily follows that the Commission's identification of "foundational facts" sufficient in their absence to render Dr. Schuman's causation opinion unpersuasive were beyond the realm of lay understanding. The record must support, therefore, the Commission's attribution of medical significance to the foundational facts it identified. Otherwise, the Commission's reliance on the foundational facts it identified to characterize Dr. Schuman's causation opinion as unpersuasive (though not inherently incredible) is tantamount to substituting personal opinion on medical causation.[11] We raise the point to sensitize the parties and the Commission to an issue that is likely to arise again on remand.

---

[11]*Cf. Seifner v. Treasurer of State-Custodian of Second Injury Fund*, 362 S.W.3d 59 (Mo. App. W.D. 2012), where we held that the Commission did not err in finding an uncontested expert causation opinion not credible. In *Seifner*, however, the expert's causation opinion was that an employee's repetitive activity cleaning

22

Point one on appeal is granted. As a result, it is unnecessary to address point two on appeal.

**Conclusion**

The Commission's Award is affirmed insofar as it finds that Ulysses sustained an accident, as modified by this Opinion to refer to Ulysses's sudden cardiac event. The Commission's Award is reversed in all other respects. This matter is remanded for the limited purpose of requiring the Commission to determine whether Patricia sustained her burden to establish that Ulysses's death did not come from a hazard or risk unrelated to employment pursuant to section 287.020.3(2)(b). If the Commission determines that Patricia sustained her burden in this regard, it shall award Patricia the compensation to which she is entitled. As explained in this Opinion, on remand, Patricia shall be deemed to have sustained her burden to establish the matters addressed by section 287.020.3(2)(a) and section 287.020.3(4).

_Cynthia L. Martin_
Cynthia L. Martin, Judge

All concur

---

tables caused a "repetitive" work injury. *Id.* at 62. The Commission found this opinion unpersuasive because the expert admitted on cross-examination that he did not know how frequently the employee engaged in the table cleaning activity--a relevant foundational fact that, within the realm of lay understanding, would influence whether an expert could opine about the cause of a "repetitive" work injury. *Id.* at 67. Moreover, the expert's causation opinion was deemed not credible because it was based on an assumption (that cleaning tables caused the employee discomfort) when the employee testified that cleaning tables caused him no problems, thus impeaching his expert. *Id.*

23