

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| NORMA HUFFMAN, | ) |
| | ) |
| Appellant, | ) |
| | ) **WD86436** |
| v. | ) |
| | ) **OPINION FILED:** |
| TREASURER OF THE STATE | ) |
| OF MISSOURI – CUSTODIAN OF THE | ) **MAY 21, 2024** |
| SECOND INJURY FUND, | ) |
| | ) |
| Respondent. | ) |

### Appeal from Labor and Industrial Relations

### Before Division Two: Anthony Rex Gabbert, Presiding Judge, Karen King Mitchell, Judge, Janet Sutton, Judge

Norma Huffman appeals the Labor and Industrial Relations Commission's decision denying her workers' compensation benefits for a permanent total disability from the Second Injury Fund. We affirm.

### Background and Procedural Information

Norma Huffman worked for approximately twenty-eight years for WireCo World Group ("Employer") where she performed a variety of tasks including operating machinery, assisting with inventory, driving a forklift, and other aspects of manual labor. Her last day working for Employer was October 27, 2015.

*Medical History and Claim Filings*

Huffman began taking prescription medication for migraines in approximately 1987. She took that medication as needed for a bad migraine, which occurred once a week on average. When those migraines occurred, they would affect Huffman's work and she needed to be in a dark room without noise. Over the years she was excused from work due to "chronic migraines and disabilitating [sic] headaches."

Huffman reported having taken Xanax for thirty years. The medical records submitted by Huffman show that on August 23, 2005, she presented to a hospital emergency room complaining that she was at work and suddenly became dizzy, numb, short of breath, and anxious. She reported being exhausted from working too much and stress from home and teenagers and life. She reported a past medical history of hypertension and anxiety disorder. The "clinical impression" was that she was suffering from "acute anxiety." She was instructed to continue her current medications and follow up with her primary care physician.

On June 14, 2007, Huffman presented to the emergency room reporting that she was at work and did not feel there was enough air in the workplace and started to hyperventilate. She felt hot and short of breath. She believed that lifting heavy items at work may have contributed. She was scheduled for a stress test to rule out cardiological factors.

On June 26, 2007, Huffman presented to the emergency room with a work-related 2-cm laceration on her right forearm which required four sutures.

On July 22, 2008, Huffman underwent an upper endoscopy as she was suffering from severe esophagitis. On August 12, 2008, Huffman presented to the emergency room complaining of back pain, lumbar pain, and lower back injury with abrupt onset. She reported heavy lifting as a risk factor.

Huffman was diagnosed with diabetes mellitus around 2010. Huffman's diabetes remains uncontrolled despite medication. Obesity was noted as an ongoing issue in Huffman's medical records. Documentation indicates that she had a negative stress echocardiogram in April 2010. On June 8, 2010, Huffman presented to the emergency room after developing chest pain while at work accompanied by dizziness, lightheadedness and difficulty breathing. A heart catherization was performed on June 8, 2010. It returned no concerning results.

Huffman presented to the emergency room on June 14, 2011 indicating that while she was at work she had numbness in the right arm, perioral numbness and numbness on the right side of her face and generalized weakness. She reported a history of hypertension for ten years, metabolic syndrome, a history of migraines, gastroesophageal reflux disease, chest pains off and on thought to be secondary to heavy labor work, hypertriglyceridemia, arthritis, anxiety and depression. An echocardiogram, chest x-rays, and brain scans were completed. Discharge diagnosis was "transient ischemic attack" and "malignant hypertension."

On January 19, 2012, Huffman underwent a cat scan of the abdomen and pelvis for lower abdominal pain and diarrhea.

On April 1, 2012, Huffman presented to the emergency room with high blood pressure accompanied by dizziness and numbness of the mouth. She was helping her mother move in the heat when the symptoms occurred. She reported being off of her blood pressure medication and not having a prescription. Her diagnosis was "hypertension." On September 24, 2012, Huffman presented at the doctor with irritable bowel issues and abdominal pain. She stated that she experienced emotional life changes when her son was in the hospital and she had it ever since. She was excused from work September 17, 2012. Records show Huffman was thereafter excused from work by her medical provider on November 29, 2012, and December 21, 2012, for "chronic migraines and debilitating headaches."

On January 23, 2013, Huffman had a follow up appointment for her diabetes, blood pressure, cholesterol and laboratory results. The report indicated that she had a "rough go as of late" as she was caring for ill parents and children and had no time for herself. She was intermittently tearful throughout the history and physical. The report stated that "Patient shows a pattern of neglect of her own personal medical conditions in favor of taking care of her family." On January 29, 2013, Huffman underwent an exercise treadmill stress test for chest pains. On May 3, 2013, Huffman had a doctor's appointment regarding migraines and reported them to be better controlled and her mood better. On June 10, 2013, and July 5, 2013, Huffman was excused from work for "chronic migraines and debilitating headaches."

In November 2013, Huffman had her right shoulder evaluated, reporting that she injured the shoulder while pulling hard on a wire spool at work. The injury occurred on October 2, 2013, and again on November 10, 2013. She missed work on November 11, 2013, and was evaluated on November 12, 2013, by a workers' compensation doctor. She was released to return to work with restrictions regarding lifting and pushing. After an MRI and a follow-up appointment on November 14, 2013, Huffman was released to "return to work without restriction." On November 19, 2013, Huffman visited a specialist to obtain a second opinion regarding her right shoulder pain. She reported previously visiting the workers' compensation doctor who stated that it was not a workers' compensation injury. She reported several additional active issues including anxiety disorder, chest pain, depression, dizziness, insomnia, diabetes mellitus type II, and migraine headaches. This doctor noted a partial thickness tear of the rotator cuff and tendinosis based on the MRI. The doctor discussed with Huffman "how uncontrolled her diabetes is" and that her blood sugars needed to be better controlled. She had a follow-up visit on November 26, 2013, and reported improving on a daily basis.

On February 7, 2014, Huffman attended a follow-up appointment for her diabetes. She reported her shoulder steadily improving. The doctor noted: "Depression. Mood is stable. Continue current medication for that." The discharge diagnosis was depression, pain in right shoulder, and diabetes. On February 12, 2014, Huffman took FMLA from work for the flu. Huffman obtained a medical excuse from work on April 6-7, 2014, for "chronic migraines and disabilitating [sic] headaches." On May 4, 2014, Huffman was

medically excused from work for two days for poison ivy. She visited the doctor on May 16, 2014, for a follow-up visit for her diabetes and other medical issues. The discharge diagnosis was diabetes mellitus type II, hypertension, and obesity.

On June 19, 2014, Huffman reported to the emergency room for dizziness. She reported hand numbness and tingling since January 2010. She stated that when she put her earplugs on at work she felt like she was in a tunnel. A CAT scan was performed and returned with "no acute finding." She was excused from work June 19 and 20, 2014. On October 2, 2014, Huffman returned for a three-month follow up and to review lab results. The doctor noted that, "Unfortunately, labs are quite remarkable, they are significantly abnormal. She continues to suffer from migraines. She continues to be fatigued. She continues to have a significant amount of stress." The record shows that Huffman's mother died mid October 2014, at the age of 80. On December 9, 2014, Huffman visited the doctor due to a rash. She reported a lot of increased stress due to the loss of her mother.

Huffman took a voluntary six-month layoff from work in February 2015 to mourn her mother's death. She looked into temporary jobs during that time to help with her income. On February 12, 2015, Huffman went to the doctor for a four-month follow up on "diabetes, hypertension, and other medical problems." She had significant improvement in her blood sugars. She reported occasional migraines but that they were pretty well controlled.

On July 1, 2015, Huffman presented to the emergency room after a motor vehicle collision wherein her car was hit from behind at low speed while she was stopped at a stop light. Huffman was driving and wearing a seatbelt. The airbag did not deploy. She reported neck pain and left shoulder pain. Huffman underwent X-rays and a CT scan at that time which returned no remarkable findings. Huffman visited her doctor on July 8, 2015, for a follow up visit complaining of right arm/shoulder pain, lower back pain, and chest pain. She also reported significant abdominal pain where the seatbelt was across her abdomen. She reported that the car was totaled, and that it was quite a significant accident. The doctor discussed Huffman's anxiety level "which has obviously been increased." The doctor prescribed Clonazepam to be taken twice daily for "Anxiety disorder NOS (300.00)."

One month later (August 2015), Huffman returned to work following her voluntary layoff. On September 23, 2015, Huffman visited the doctor "for a follow up on stress and a regular follow up." Huffman reported that she had been undergoing a lot of stress following her return to work after her six-month layoff. She reported a "significant amount of stress at work, new job requirements and what not." The doctor suspected Huffman's diabetes was uncontrolled and ordered labs to make that determination. The doctor advised continued use of Prozac and Clonazepam for Huffman's anxiety disorder, indicating that the Prozac could be increased if necessary. Huffman declined the increase. Huffman's hypertension was well-controlled. She presented with soft tissue

lumps in her lower extremities. The doctor ordered an ultrasound to ensure they were nothing more than lipomas.

Two days later, on September 25, 2015, Huffman was at work assisting another worker in flipping a spool of metal wire weighing approximately 400 pounds. While doing so, Huffman claimed to have heard and felt a pop in her right shoulder and the onset of pain. Huffman's primary doctor initially treated her for a rotator cuff injury. The doctor referred her to a specialist who met with her on October 1, 2015. The primary doctor also indicated that the office had received paperwork from the employer regarding "very comprehensive testing for anxiety and mental fitness", so the doctor referred Huffman to "Psychiatry."

The specialist for the shoulder issue, Dr. D.,[1] did not believe the injury was work-related and felt care and treatment should be on a personal health basis. The doctor recommended an MRI scan if Huffman did not improve. Huffman visited another doctor, Dr. M., on October 16, 2015. This doctor noted concern about an acute rotator cuff tear and recommended an MRI scan. On October 22, 2015, the doctor restricted Huffman to no overhead work and no lifting more than ten pounds using the right arm. Dr. M. opined the injury was the prevailing factor in the need for care and treatment. Huffman was

---

[1] Witnesses discussed herein will not be identified by name, pursuant to Section 509.520, RSMo Cum. Supp. 2023.

taken off work on October 27, 2015, and she did not perform any work for Employer thereafter. Her official last day of employment was July 29, 2016.

Huffman filed an original claim for workers' compensation on December 21, 2015, alleging that on September 25, 2015, she suffered injury to her "Right Shoulder, Right Arm, Psychological, Body as a Whole." She alleged that, during the course and scope of her employment, she was helping another worker flip a 400-pound spool of metal wire off of a pallet when she heard a pop and began to have excruciating pain in her right shoulder and psychological injury while working for Employer.

On December 30, 2015, Huffman's primary doctor, Dr. T, wrote a letter indicating that Huffman had a rotator cuff tear and was in limbo as far as surgery. The doctor indicated that Huffman was significantly impaired as far as heavy labor and recommended intervention or a light duty work restriction, but would "defer that to the ongoing workman's compensation issues surrounding her shoulder."

On January 21, 2016, an advanced practice registered nurse conducted a psychological evaluation of Huffman to evaluate her "anxiety." The "History of Presenting Illness" portion states that Huffman discussed taking a voluntary layoff from work to mourn her mother's passing. Huffman reported that she also had to be off work after the motor vehicle accident. She was then called back to work in August of 2015, and "then everything began to get worse." Huffman reported that people were leaving and she had difficulty with her twenty-eight years of seniority, which was apparently jeopardized when she took the voluntary layoff. Since she had returned to work, she had

increased anxiety and worry. She startled easily, tended to avoid crowds, had recurrent memories of old abuses that were work related, and memories of sexually charged comments in the past made by coworkers, informants and superiors in her job. She at times had difficulty falling asleep because of everything going through her head. She was quite worried about her job. She was a divorced, single mother of two sons, ages thirty and thirty-one, who both lived with her. She viewed herself as loyal and a hard worker. She feared losing her job. She had more migraines due to her anxiety and had missed work at times because of them. She reported her mood at the examination to be anxious and depressed. The recurrent memories Huffman discussed suggested possible "posttraumatic stress symptomatology." Therapy was strongly recommended with a notation that she would do quite well as she was motivated for treatment and had good insight. For her treatment plan, it was noted that Huffman's Prozac had recently been increased to 40 mg, and she was to "continue with the Prozac 40 and clonazepam 0.25 up to twice a day as needed for anxiety." She was provided information for counseling resources, and agreed to utilize community resources she was aware of for any urgent medical or psychiatric needs. Her "Diagnoses" were "Adjustment disorder with anxiety and depression" and "Rule out posttraumatic stress."

On July 27, 2016, Dr. M. performed surgery on Huffman's right shoulder. Dr. M. released Huffman to work full duty on September 22, 2016. After recovering from surgery, Huffman worked as a dog walker for approximately six months, and as a stocker for Wal-Mart for less than two weeks.

Huffman filed an amended claim for compensation on August 4, 2016, to include a permanent total disability claim against the Second Injury Fund, alleging an October 2, 2013, preexisting disability to the right shoulder.

On November 30, 2016, Dr. R. conducted an independent medical examination on behalf of Huffman and authored an addendum report on February 4, 2017. Dr. R. rated the September 25, 2015, injury to Huffman's right shoulder at 35% at the 232-week level and provided no permanent restrictions. Dr. R. rated no other disabilities from the September 25, 2015, work injury. Dr. R. stated in the original report that Huffman could continue full duty work and was not likely to require future medical care. In the addendum, Dr. R. stated that Huffman had returned to work performing light duty. The doctor provided Huffman with permanent restrictions of lifting no more than twenty pounds to chest level with both arms, no overhead lifting, and no repetitive reaching, grasping, pushing or pulling.

On February 3, 2017, Huffman amended her claim to add preexisting disabilities of "Diabetes, hypertension, multiple transient ischemic attacks, post-traumatic stress disorder, heart problems and irritable bowel syndrome."

On January 29, 2018, a stipulation for compromise settlement was approved between Huffman and Employer, with Huffman settling her claim with Employer for 24% to the right shoulder at 232-week level. An addendum to the stipulation states that the settlement closes the employee's claim against Employer and the insurer, but that Huffman's claim against the Missouri Second Injury Fund remained open.

11

On March 7, 2018, Huffman obtained a psychological evaluation from Dr. J. The stated purpose of the evaluation was to "assess the status of her current psychological functioning and determine if and how her current psychological functioning is related to her injury and premorbid adjustment." Dr. K. was assessing Huffman at the same time, as Dr. J.'s report notes that Huffman "was administered IPE testing during breaks with Dr. [K.]."

On the Beck Depression Inventory, Huffman scored in the range of "moderate depression." On the BBHI2 test, which was noted as "a test intended to serve as a source of clinical hypothesis about possible bio-psychosocial complications facing medical patients," Dr. J. reported that, "Her depression is a downstream psychological consequence of her September 25, 2015 work-related injury." Huffman scored high on the Somatic Complaints Scale, and moderately high on the Pain Complaints Scale. Dr. J. noted, "She is preoccupation by her pain experience which has a disabling effect." Huffman scored extremely high on the Functional Complaints Scale, with Dr. J. reporting that, "Ms. Huffman reported an extreme level of perceived disability. Her perception of functional disability is genuine and real. At the time of this evaluation this is part of her identity."

Huffman scored high on the depression scale, with Dr. J. noting that "this level of depression can impede physical rehabilitation and recovery," and moderately high on the anxiety scale, with Dr. J. noting that "her level of anxiety could impede physical rehabilitation and recovery." Dr. J. interpreted Huffman's MMPI-2 scores to show that

12

"the intensity of her psychological distress is significant" and that "Ms. Huffman's psychological disabilities are complex." Dr. J. also noted that "Ms. Huffman's MMPI2 peak score occurs with very high frequency among individuals involved in personal injury litigation." On the Disability Assessment, Dr. J. reported that Huffman's "results indicate that Ms. Huffman's ability to understand and communicate with other people, her ability to get around, to take care of herself, and in getting along with others are mildly to disabled." Huffman "reported significant disability with regard to performing household activities and working" and attributed that to medical problems. Dr. J. stated that, "in my opinion her inability to remain active results in significant psychological disability."

Dr. J. diagnosed Huffman with Major Depressive Disorder, chronic, moderate; Generalized Anxiety Disorder, chronic; and Unspecified Trauma-and stressor Related Disorder (by history). Dr. J. issued the opinion that Huffman's exposure to risk (physically demanding, dangerous, third-shift work) in the course of her employment working in a production capacity for Employer with a claim date of September 25, 2015, is the direct, proximate and prevailing factor for her development of a Somatic Symptom Disorder, persistent, pain type, and a Major Depressive Disorder, chronic, moderate. (Dr. J. later stated in a deposition that the Somatic Symptom disorder was mistakenly included and was not part of the diagnosis.) The doctor believed that Huffman's prior episodes of depression when family members passed and home stressors occurred could best be described as Adjustment Disorder with depressed mood, but that "Huffman's depression

13

following her work-related injury on September 25, 2015 had followed a different course and has resulted in significant psychological disability." Dr. J. stated: "This psychological disability flows as the result of primary injuries described in her claim." Dr. J. noted that Huffman's depression increases her pain experience. Further, that "Given the length of time she has suffered from her psychological disability subsequent to her September 25, 2015 injury, her condition is chronic and a diagnosis of adjustment disorder is inappropriate."

Dr. J. discussed Huffman's longstanding treatment for anxiety and that she was developmentally traumatized by her mother's bipolar depression and ex-husband's emotionally and physically abusive behavior. Huffman's traumatic life experiences had a significant impact on her psychological development. Dr. J. opined that the evaluation indicated that Huffman's "psychological disabilities have deteriorated considerably following her work-related injury on September 25, 2015." Further, that "taken as a whole, Ms. Huffman was clearly suffering severe multifaceted psychological disability that impacted all aspects of her life on the day of her evaluation. Her psychological disabilities are complex, long standing and taken as a whole are overwhelming." Dr. J. was of the opinion that Huffman had reached maximum psychological improvement, that she perceived herself as disabled and unable to work, and that her belief that she is functionally disabled has become part of her identity. Dr. J. stated that Huffman's daily pain experience, depression, and anxiety are here to stay.

Dr. J. assessed Huffman a total psychological disability rating of 45%, with 25% assigned to her Generalized Anxiety Disorder and Unspecified Trauma or Stressor-Related Disorder "which rise to the level of being pre-existing industrially disabling psychological disabilities." Further, that "as a result of her work-related injury which occurred on September 25, 2015, Ms. Huffman has developed a Major Depressive Disorder, moderate." Dr. J. assigned "another 20% of psychological disability to the psychological disability that resulted as a consequence of her work-related accident on September 25, 2015." Dr. J. additionally stated:

> When one considers the significance of the primary psychological and physical disabilities resulting from Ms. Huffman's injuries with a claim date of September 25, 2015 my opinion is that Ms. Huffman is not permanently and totally disabled based upon the combination of the psychological and physical disabilities attributable to the primary injury, in isolation.

> It is my opinion that Ms. Huffman is permanently and totally disabled by the combination of her pre-existing industrially disabled physical and psychological disabilities in combination with the physical and psychological disabilities she incurred as a result of her work-related injury September 25, 2015.

Dr. J. recommended that Huffman's medication protocol be re-evaluated by a psychiatrist, noting that her current medications do not appear to be working; that she receive treatment in behavior methods of pain management to combat her pain and mitigate her depression as Dr. J. believed that Huffman's pain perception from her various medical ailments was increased by depression; that Huffman consult her church leaders to address the resentment harbored toward Employer and medical professionals

15

regarding the September 25, 2015, work injury; and that Huffman seek remedies to address her sleep disturbance.

Dr. K. also examined Huffman on March 7, 2018. The doctor expressed that the evaluation was "specifically in reference to potential Second Injury Fund liability associated with a primary work injury claim of September 25, 2015," noting that the primary work injury "was to the right shoulder." Further, that the "additional issue" Dr. K. was "looking at is whether or not additional Second Injury Fund liability is present associated with this primary injury claim date." Dr. K. reviewed Huffman's "extensive" medical records and was provided a copy of the Claim for Compensation. Consequently, the doctor was aware that Huffman contended that she sustained right shoulder, right arm, psychological, and whole-body damage at work on September 25, 2015.

Upon reviewing Huffman's medical history, the doctor believed a significant industrial disability to be Huffman's history of diabetes mellitus which had historically been poorly controlled. Dr. K. also believed there to be industrial disability associated with headaches. These were the only two pre-existent industrial disabilities the doctor believed had vocational implications of significance. The doctor did "not see evidence that any of the other multiple diagnoses listed had vocational implications where she was hindered or limited in her actual work or would have a significant obstacle to reemployment."

Dr. K. emphasized that the September 25, 2015, claim is not totally disabling when considered in isolation. The doctor adopted the compromise settlement between

16

Huffman and Employer for 24% permanent partial disability to the right shoulder for the September 25, 2015, workplace injury and assigned various restrictions. He assigned 15% permanent partial disability for prior disabling headaches, and 15% permanent partial disability to the body as a whole for Huffman's diabetes. The doctor did note a "potential pre-existent industrial disability" of significance being the "issue of separate psychological disability" for which the doctor recommended a mental health evaluation. The doctor stated that the doctor would be willing to review any additional psychological/psychiatric data and/or vocational data that becomes available, but that, "at this point, it is my opinion that Ms. Huffman is, in fact, permanently totally disabled based on the pre-existent physical and psychological industrial disabilities combined with the additional disability flowing from the primary injury sustained on September 25, 2015."

On February 14, 2019, Huffman underwent a vocational assessment by T.C. to "determine her rehabilitation potential." As part of the assessment, T.C. reviewed the medical reports by Dr. K. and Dr. R., the psychological evaluation by Dr. J, and Huffman's September 6, 2018, deposition. T.C. considered Huffman's diabetes, migraine headaches, and the need to utilize medication at work, all significant hindrances and obstacles to employment. T.C. opined that Huffman had no skills that transferred to light or sedentary jobs. Further, that for lighter sedentary jobs, Huffman should be considered an unskilled worker. T.C. concluded:

17

When one considers the entirety of the physical restrictions, noting the need to alternate sitting and standing, the psychological impairments precluding social functioning in combination with Ms. Huffman's advanced age, high school education, lack of transferrable skills, it is my opinion that she is now totally vocationally disabled. It is my opinion the total disability is as a result of the pre-existing psychological issues, diabetes, migraine headaches, in combination with injuries to the right shoulder of September 25, 2015.

An August 30, 2020, addendum report was issued by Dr. K., prompted by Dr. J.'s psychological evaluation of Huffman, T.C.'s vocational report, and the question of Second Injury Fund liability. Dr. K. stated that neither the pre-existent headaches nor the pre-existent diabetes would qualify to trigger Second Injury Fund liability. Dr. K. opined, however, that, "if one considers the synergism of combining only the qualifying disability represented by the preexistent psychological disability with the physical and psychological disability for which the September 25, 2015, claim is the prevailing factor in its development, it is my opinion that Ms. Huffman is, in fact, permanently totally disabled."

*Administrative Law Judge and Commission Findings*

The Administrative Law Judge ("ALJ") hearing Huffman's workers' compensation case noted that Huffman had alleged that she suffered psychological injury in the work accident of September 25, 2015, but settled that claim for 24% permanent partial disability of the right upper extremity at the 232-week level. The stipulation included no settlement for disability as to the alleged psychological injury. The ALJ noted that, only after settling her claim with Employer did Huffman obtain expert

18

opinions regarding her psychological injury. The ALJ stated that, based on Huffman's allegation of permanent total disability and Second Injury Fund liability, Huffman must show that the work injury of September 25, 2015, resulted in psychological injury which combined with her pre-existing condition to aggravate or accelerate that condition rendering her permanently and totally disabled. The ALJ concluded,

> Claimant's decision to settle her claim for disability to the right shoulder only must have significance. The evidence presented indicates no psychological disability as apportioned to her work-related accident on September 25, 2015 and subsequent settlement. That being the case, I find Claimant failed to meet her burden of proof to establish Second Injury Fund liability and therefore deny the claim for compensation to the Second Injury Fund.

The Commission affirmed and adopted the award of the ALJ, as supplemented. The Commission stated that, Huffman alleged a preexisting psychological disability related to major depressive disorder, generalized anxiety disorder, and unspecified trauma, and to establish that she was entitled to compensation from the Fund, Huffman "was required to establish that qualified preexisting psychological disability combined with psychological disability related to her September 25, 2015 work injury to result in permanent total disability." The Commission noted that, "a Fund claim is necessarily derivative from the employee's primary work injury claim." The Commission found that the ALJ denied Huffman's claim because the testimony of the employee and her experts failed to persuade the ALJ, as a threshold issue, that Huffman sustained any psychological disability related to her September 25, 2015 work injury. Further, that the ALJ did not disregard or ignore the opinions of Huffman's experts, but instead

19

discredited the experts' views because their opinions were not sought until after Huffman's stipulation for compromise settlement based on 24% permanent partial disability of the right shoulder at the 232-week level. The Commission found that the ALJ did not err in considering Huffman's primary injury settlement as a factor in evaluating her Fund claim. The Commission independently concluded that Huffman's evidence, though not controverted, was insufficient to support her claim.

This appeal follows.

**Standard of Review**

"The Commission's decision must be 'supported by competent and substantial evidence upon the whole record.'" *Weibrecht v. Treasurer of Missouri*, 659 S.W.3d 588, 592 (Mo. banc 2023) (quoting Mo. Const. art. V, sec. 18). On appeal, the Commission's factual findings are conclusive and binding in the absence of fraud. *Id.* (citing Section 287.495.1).[2] We defer to the Commission's determinations regarding the credibility of witnesses and weight of the evidence. *Id.* On appeal, we only review questions of law and may modify, reverse, remand for rehearing, or set aside the award on only four grounds: 1) The Commission acted without or in excess of its powers; 2) The award was procured by fraud; 3) The facts found by the Commission do not support the award; 4) There was not sufficient competent evidence in the record to warrant the making of the award. *Id.* (citing Section 287.495.1(1)-(4)). The evidence is examined in context of the

[2] All statutory references are to the Revised Statutes of Missouri as updated through 2015, unless otherwise noted.

whole record when determining "if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222-223 (Mo. banc 2003). The evidence is viewed objectively, and not in the light most favorable to the award. *Id.* at 223.

## Point on Appeal

Huffman contends on appeal that the Commission and ALJ erred in entering awards denying her compensation on the basis that she did not sustain a psychological injury and disability from her September 25, 2015 work accident, arguing there was not sufficient competent evidence in the record to warrant making that award. Huffman contends that, in light of the whole record, including uncontradicted and unimpeached testimony from medical and psychological experts, and in light of the applicable law, Huffman's prior stipulation for compromise settlement with Employer and the timing of medical and psychological testimony are so non-probative that no reasonable mind could believe that Huffman did not sustain a psychological injury and disability from her September 25, 2015, work accident. We disagree.

To trigger Fund liability for claims occurring after January 1, 2014, the following conditions need to be met:

   a. An employee has a medically documented preexisting disability equaling a minimum of fifty weeks of permanent partial disability compensation according to the medical standards that are used in determining such compensation which is:

21

(i)      A direct result of active military duty in any branch of the United States Armed Forces; or

(ii)     A direct result of a compensable injury as defined in section 287.020; or

(iii)    Not a compensable injury, but such preexisting disability directly and significantly aggravates or accelerates the subsequent work-related injury and shall not include preexisting injuries or conditions that do not aggravate or accelerate the subsequent work-related injury; or

(iv)    A preexisting permanent partial disability of an extremity, loss of eyesight in one eye, or loss of hearing in one ear, when there is a subsequent compensable work-related injury as set forth in subparagraph b of the opposite extremity, loss of eyesight in the other eye, or loss of hearing in the other ear; and

b.  Such employee thereafter sustains a subsequent compensable work-related injury that, when combined with the preexisting disability, as set forth in items (i), (ii), (iii), or (iv) of subparagraph a. of this paragraph, results in a permanent total disability as defined under this chapter…

§ 287.220.3(2)(a).

The record shows that Huffman suffered from a variety of ailments prior to September 25, 2015, including anxiety and depression, and was prescribed medication to address those issues. The record shows "active" anxiety and depression in 2011. Significant psychological stressors for Huffman unrelated to work are noted as having occurred prior to September 25, 2015, and Huffman took a six-month voluntary layoff from February 2015 to August of 2015. On July 1, 2015, Huffman was rear-ended at a stoplight and complained of right arm/shoulder pain and significantly increased anxiety.

The doctor prescribed Clonazepam to be taken twice daily for "Anxiety disorder NOS (300.00)."

When Huffman returned to work following her voluntary layoff, records show that she was experiencing a "significant amount of stress at work, new job requirements and what not." A doctor suspected Huffman's diabetes was uncontrolled and ordered labs to make that determination. The doctor advised continued use of Prozac and Clonazepam for Huffman's anxiety disorder.

Just after Huffman's September 25, 2015, work incident, she was referred to "Psychiatry" for "very comprehensive testing for anxiety and mental fitness" due to paperwork her primary doctor received from Employer but felt unqualified to address. The doctor noted regarding Huffman's anxiety that "she has occasional flares, which trigger migraines and there is a complex interplay between the two. She will occasionally need to miss work because of that, but I cannot predict the future and cannot predict the occurrences and I cannot necessarily weigh in on her fitness for work from a psychiatric standpoint." This was written three months after September 25, 2015, and there was no mention of the September 25, 2015, work incident in the letter.

Notably, in the January 21, 2016, evaluation which occurred as a result of that referral, although the death of Huffman's mother, her voluntary layoff, fear she may not be able to work up to her own standards, and fear of job loss were all noted as increased stressors that impacted her anxiety, Huffman's September 25, 2015, alleged work injury is not mentioned in the report except for a notation of "Rotator cuff tear" under the

23

"Medical/Surgical History" portion of the report. Huffman's "Diagnoses" were "Adjustment disorder with anxiety and depression" and "Rule out posttraumatic stress." Therapy was strongly recommended with a belief that Huffman would respond well as she was motivated for treatment and had good insight. For a treatment plan, it was noted that Huffman's Prozac had recently been increased to 40 mg. She was to "continue with the Prozac 40 and clonazepam 0.25 up to twice a day as needed for anxiety." Huffman was provided information for counseling resources, and agreed to utilize community resources she was aware of for any urgent medical or psychiatric needs.

Nothing in the record shows that Huffman followed up on this advice. The record lacks any indication that over the next two years Huffman sought psychiatric treatment or addressed her anxiety and depression in any manner other than how she had always addressed her anxiety and depression—via prescriptions of the same medications she had been taking prior to September 25, 2015. When Huffman met with Dr. J. more than two years after September 25, 2015, Huffman reported to Dr. J that she had used Xanax several times a week for her adult life. Neither Prozac nor Clonazepam are mentioned specifically in Dr. J.'s report, and there is no record as to what extent Huffman actually used the prescribed medications. When Huffman visited her primary doctor on May 27, 2016, the doctor noted that Huffman was under a lot of stress and was having a lot of anxiety, and continued to be in a state of struggle with her employer over benefits and overall health. Huffman was in chronic pain, but was not taking her pain medication as prescribed as she was cutting the medication in half and disposing of the rest. The doctor

24

noted that she "has had some panic and significant psychosocial stressors." The doctor advised that Huffman pursue psychological assistance, believing Huffman to have "uncontrolled depression which I think is contributing and may be causal" for other symptoms, and inadequately treated anxiety disorder. Again, nothing in the record suggests that these recommendations were pursued. Moreover, where the record shows a significant interplay between Huffman's physical pain and psychological distress,[3] Huffman's recorded failure to follow through with prescribed treatments to address her pain raises significant question as to the level Huffman's physical and psychological conditions could have improved had she done so. Likewise, where Dr. J. indicated that Huffman's level of anxiety and depression "can impede physical rehabilitation and recovery," the lack of any record of follow-through with recommended psychological treatments raises similar questions as to the level Huffman's physical and psychological conditions could have improved. A reasonable fact finder could justifiably consider Huffman's experts' permanent disability conclusions to lack credibility where remedial treatments, or the lack thereof, are not addressed by those experts.

In viewing the record as a whole, we disagree with Huffman's contention that the stipulation for compromise settlement and the timing of the medical and psychological evidence Huffman used to support her claim are so non-probative that no reasonable

---

[3] Dr. J. reported that Huffman had a preoccupation with her pain experience which had a disabling effect. Further, that Huffman reported an unusual level of diffuse somatic complaints, and was aware that her level of stress contributed to the intensity of her physical problems.

mind could believe that she did not sustain a psychological injury and disability from her September 25, 2015, work accident. The timing of the post-settlement evidence is significant because Huffman claimed in her filings to have suffered a psychological injury from a work accident on September 25, 2015, but two years later when the compromise settlement was reached, despite having numerous consultations, treatment, surgery on her shoulder, and even recommendations for counseling to address ongoing anxiety and depression, there was no evidence to support a psychological work injury or disability specifically related to September 25, 2015. One could reasonably expect that, where a primary psychological work injury/disability was claimed, the voluminous pre-settlement medical records would have documented it in some fashion. A reasonable fact-finder could presume that, where there are no records documenting a psychological injury specific to September 25, 2015, in the two years following September 25, 2015, and a psychological injury was claimed but not included in the settlement with Employer regarding September 25, 2015, there was no psychological injury related to September 25, 2015. Consequently, it was not unreasonable for the ALJ/Commission to view with skepticism consultations regarding Huffman's psychological condition that were obtained more than two years after the alleged primary psychological injury and after Huffman settled her primary injury claim for no psychological injury.

Huffman cites *Seifner v. Treasurer of Missouri*, 362 S.W.3d 59 (Mo. App. 2012), and argues that her settlement with Employer was separate from her case against the Second Injury Fund, and the parties are free to fully litigate each aspect of the case,

26

including the employee's final injury. Huffman argues that her settlement with Employer cannot be used as conclusive evidence regarding the nature of her primary injury. While the Commission is not bound by the terms of a settlement, it "does serve as relevant evidence of the nature and extent of the employee's permanent disability attributable to the primary injury." *Treasurer of the State-Custodian of the Second Injury Fund v. Steck*, 341 S.W.3d 869, 873 (Mo. App. 2011). The settlement here is part of the record which we review and, as discussed above, is relevant in this case.

The Commission independently concluded that Huffman's evidence was insufficient to support her claim of a psychological injury stemming from September 25, 2015. Reviewing the record as a whole, along with the Commission's credibility determinations, we find sufficient competent evidence in the record to support that conclusion. Dr. J., whom Huffman relies on for her claim, opined that, "While I hope Ms. Huffman's psychological condition will improve, and I am recommending treatment, I do not believe it will improve in a material way. Psychological treatment outcomes are palliative, not curative at this point." Dr. J. also concluded that Huffman had reached "maximum psychological improvement." The doctor noted that, Huffman's "current medications do not appear to be working, especially with regard to her depression," and recommended that her current medication protocol be re-evaluated by a psychiatrist. Yet, more than two years prior to Dr. J. issuing his opinion, counseling was strongly recommended for Huffman with a belief that she would respond well. This never occurred. Huffman used the same psychiatric medication for years prior to September

27

25, 2015, and despite Dr. J.'s conclusion that Huffman's psychological condition deteriorated after September 25, 2015, there is no indication that she ever consulted a psychiatrist to address whether her medications should be evaluated for effectiveness. A reasonable factfinder could conclude that Dr. J.'s opinion that Huffman's psychological condition could not be alleviated with treatment lacked foundation where two years after the alleged disabling psychological injury there had been no attempt at curative treatment.

Likewise, the record shows that when Huffman "reported significant disability with regard to performing household activities and working" and attributed that to medical problems, Dr. J. concluded that, "in my opinion her inability to remain active results in significant psychological disability." The record is replete with medical problems suffered by Huffman unrelated to any September 25, 2015, work injury, including preexisting uncontrolled diabetes, obesity, hypertension, irritable bowel syndrome, depression, anxiety, and pain related to other occurrences such as a June 30, 2015, car accident. Dr. J. does not explain that Huffman's inability to remain active resulted from any September 25, 2015, injury. Huffman worked for several months as a dog walker after September 25, 2015. Further, the record shows a significant period of inactivity by Huffman directly preceding September 25, 2015, when she voluntarily took six months off from work.

Dr. J. states that Huffman suffered depression from September 25, 2015, different from any she had previously suffered. Dr. J. states that Huffman's prior depression when

28

family members passed, etc., could best be described as Adjustment Disorder with depressed mood. Dr. J. states that Huffman suffered deep grief reactions when family members died, but that antidepressant medications were appropriate treatment methods to help her through those times "and she always maintained her occupational and social/interpersonal adjustment while struggling with these most difficult life events." Dr. J. opines that Huffman's depression following September 25, 2015, followed a different course resulting in significant psychological disability. Yet, nowhere in Dr. J.'s report does the doctor acknowledge the six months Huffman took leave from work just prior to September 25, 2015, to grieve her mother's death, and how this might be reconciled with his statement that Huffman had always previously maintained occupational adjustment. Two days prior to September 25, 2015, Huffman reported that she was undergoing a significant amount of stress from simply returning to work.

A reasonable fact finder could find that Dr. J.'s conclusion that Huffman's depression took a different course after September 25, 2015, lacked credibility where the basis for the conclusion (i.e., that with prior difficult life events Huffman always maintained her occupational and social/interpersonal adjustment) is not supported by the record.

There are other inconsistencies in the record that a reasonable fact finder could find cut against Huffman's claim of a September 25, 2015, psychological injury and permanent disability. After Huffman's shoulder surgery, she was given a full release on September 22, 2016. Although some records indicate that Huffman lasted less than two

weeks as a stocker at Walmart because she could not meet the physical demands, when asked in a deposition if she was unable to continue work "because of your conditions" she responded, "Yes. Because my foreman, my boss was kind of mean and it made me feel like it was Wire Rope all over again with the bosses there." Huffman's own testimony does not necessarily support that it was for physically or psychologically disabling reasons that she quit working for Walmart.

On March 7, 2018, Dr. K. reviewed all of Huffman's medical records prior to reaching a conclusion and only noted two pre-existent industrial disabilities of significance—her diabetes and headaches. Although Dr. K. considered of significance a potential *pre-existent* industrial disability of a separate psychological disability and recommended a mental health evaluation, Dr. K. made no mention of a psychological injury related to September 25, 2015.

Two and a half years later, on August 30, 2020, Dr. K. issued an addendum indicating that the doctor had reviewed Dr. J.'s psychological evaluation of Huffman and T.C.'s vocational report. This is the first time Dr. K. referenced a psychological component to Huffman's September 25, 2015, work injury claim and Dr. K. essentially accepted Dr. J.'s conclusion that there was a separate psychological/psychiatric disability for which the primary work injury claim of September 25, 2015 was the prevailing factor in its development. We note that Dr. K.'s addendum was based off of Dr. J.'s written report which opined that Huffman's exposure to risk (physically demanding, dangerous, third-shift work) in the course of her employment working in a production capacity for

Employer with a claim date of September 25, 2015, was the direct, proximate and prevailing factor for her development of a Somatic Symptom Disorder, persistent, pain type, and a Major Depressive Disorder, chronic, moderate. Dr. J. later stated that the Somatic Symptom Disorder diagnosis was a mistake and should not have been included. It is unknown if this redaction by Dr. J. would have affected Dr. K.'s ultimate conclusions. Regardless, where a reasonable fact finder could consider Dr. J.'s conclusions to lack credibility, and Dr. K.'s opinions are based on Dr. J.'s findings, a reasonable fact finder could conclude that Dr. K.'s conclusions lack credibility as well.

"A reviewing court considers whether the Commission could have reasonably made its findings, and reached its result, upon consideration of all the evidence before it." *Hornbeck v. Spectra Painting, Inc.*, 370 S.W.3d 624, 629 (Mo. banc 2012). We may not substitute our judgment on the evidence, "and when the evidence before an administrative body would warrant either of two opposed findings, the reviewing court is bound by the administrative determination, and it is irrelevant that there is supportive evidence for the contrary finding." *Id.* (internal quotation marks and citation omitted). Huffman had not only the burden of producing evidence to support her claim, but also the burden of persuading the fact finder to view the facts in a way that favored her. *Mar. v. Treasurer of State*, 649 S.W.3d 293, 299-300 (Mo. banc 2022). Huffman met her burden of production, but not her burden of persuasion.

The Commission did not err in entering awards denying compensation to Huffman on the basis that she did not sustain a psychological injury and disability from a

September 25, 2015, work accident as there is sufficient competent evidence, in light of the whole record, to warrant the award.

## Conclusion

The Commission's Final Award is affirmed.

_____
Anthony Rex Gabbert, Judge

All concur.